629 A.2d 1046

**ECC RETIREMENT VILLAGE, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 14, 1992.

Decided June 11, 1993
(Previously filed as non-report).

Publication Ordered July 30, 1993.

William D. Lenhan, for petitioner.

Kathleen Grogan, Asst. Counsel, for respondent.

Before PALLADINO and FRIEDMAN, JJ., and NARICK, Senior Judge.

FRIEDMAN, Judge.

█ ECC Retirement Village (ECC) appeals from a final action by the Pennsylvania Department of Public Welfare (DPW) which held that twenty (20) residents at ECC were ineligible for medical assistance. Following an audit of ECC records for the years 1987 and 1988, DPW determined that ECC owed DPW reimbursement in the amount of $414,871.96 for medical assistance which DPW had provided to those residents under the Medical Assistance Program. ECC appealed and the hearing examiner issued an order affirming the audits and denying the relief requested by ECC. ECC appeals to this court.[1] We affirm.

This case cannot be understood without a review of its history which includes a previous decision of this court.[2] In 1974, ECC assumed ownership of a retirement home in Myerstown, Pennsylvania. In contracts signed prior to 1975, residents of the retirement village agreed to turn over to ECC

---

1. Our scope of review is limited to determining whether any constitutional rights were violated, whether an error of law was committed and whether necessary findings are supported by substantial evidence. *Atlas Development Association Inc. v. Commonwealth, Department of Public Welfare,* 138 Pa.Commonwealth Ct. 24, 587 A.2d 817 (1991).

2. *ECC Retirement Village v. Department of Public Welfare,* 89 Pa.Commonwealth Ct. 268, 492 A.2d 466 (1985) (*ECC I*).

all of their assets and whatever governmental or other benefits might be available to them and agreed that failure to turn over all assets and benefits could result in dismissal from the facility. Following its audit of ECC's 1981 records, DPW determined that the residential agreements between ECC and the residents (the pre–1975 agreements) were life-care contracts which rendered the residents ineligible to receive medical assistance. On appeal of the DPW determination, we affirmed.

The Commonwealth considers a life-care contract to be a third-party resource which must be used to the fullest extent possible before payment is made by medical assistance. As long as this third-party resource is viable, the residents were not eligible for medical assistance. *ECC I*.[3]

In 1986, in response to *ECC I*, the 20 residents with pre–1975 agreements signed a Residential Agreement Modification and a new Facility Agreement (collectively, the 1986 agreements). The Residential Agreement Modification stated that the prior agreement between the parties had been interpreted by DPW in a manner that the parties had never intended, that all assets of the residents and interest earned on those assets had been exhausted and that the parties would enter into a new agreement (the Facility Agreement). The Facility Agreement provided that the patient agreed to pay and the facility to accept a specified payment "[t]o furnish room, board, laundered linens and bedding, nursing care, and such personal services as may be required for the health, safety, good grooming, and well-being of the patient. . . . [t]o obtain the services of a licensed physician. . . . [and t]o arrange for the transfer of the patient to the hospital [when necessary]." (R.R. at 51a.) In addition, if the resident was eligible for medical assistance or other governmental benefits, ECC agreed to accept assignment as payment in full of the financial agreement between the parties.

---

3. The regulations relied on by the court have been re-written and reorganized since the date of *ECC I*. The substance of the regulations, however, remains essentially the same. *See, e.g.*, 55 Pa.Code §§ 161.73, 161.83 and 178.6.

Before the 1986 agreements were signed, Dr. Jeung Rim, an internist who was the in-house physician, examined the residents and determined that 9 of the 20 residents concerned were not competent to handle their financial affairs. Competency actions were brought before the Orphan's Court which found the 9 residents to be incompetent and directed the appointment of guardians for them. The family members of the 9 residents were asked whether they would serve as guardians or would prefer ECC to do so. In each case where a response could be obtained, the family member requested in writing that ECC take on that responsibility. The ECC financial director, Floyd Leonard, took over the guardianship responsibilities for the 9 incompetent residents and signed the 1986 admission agreements for them. The 11 competent residents signed on their own behalf.

ECC contends that DPW cannot deny medical assistance because the 1986 modification and facility agreements are valid and resolve the problems addressed in *ECC I* and because the pre–1975 agreements were not life-care contracts.[4] ECC also contends that this court lacks jurisdiction

---

4. As to the question of whether the pre–1975 agreements were in fact life-care contracts, there is no room for debate. This court, in its 1985 decision, stated unambiguously that

[P]etitioner [ECC] argues, since these contracts do not contemplate an absolute obligation on its part to provide care to its residents for their entire lives, they cannot be construed as life-care contracts. We disagree. Petitioner's argument completely ignores 55 Pa.Code § 191.23(b)(1). This regulation, upon which the DPW's decision is based, provides:

(1) *Contracts guaranteeing maintenance.* The typical contract of this type shows that at the time the person entered the institution he transferred to the institution all of his assets and agreed to transfer to the institution all property that he might ever acquire at a later date. In return, the institution agreed to furnish him with complete maintenance either for life *or for a period specified in the contract,* or for a period which can be determined from the contract. A person living in an institution who has a contract with the institution under which he is entitled to maintenance *for a period which has not yet expired,* is eligible for assistance only if the following occur:

(i) If the institution claims it is financially unable to comply with the terms of the contract. Evidence satisfactory to establish this must be presented by the governing body of the institution in accordance with § 181.24(b) (relating to procedure). (Emphasis added.)

to consider the validity of the competency proceedings.[5]

DPW responds that ECC was not entitled to medical assistance payments for the 20 residents because the 1986 agreements were void both for lack of consideration and because the residents signed the agreements only after receiving incorrect and misleading information. Thus, according to DPW, the pre–1975 agreements which this court determined to be life-care contracts in *ECC I* remained in effect. Because, pursuant to the pre–1975 agreements, the residents had improperly transferred assets prior to receiving assistance, the auditors' demand for reimbursement of the medical assistance was proper. We agree.

▮ The validity of the 1986 agreements is called into question because these agreements involved the same 20 residents whose eligibility for medical assistance had already been ruled upon in 1985. In *ECC I* we determined that, under the pre–1975 agreements, ECC was responsible for providing care to the residents as long as they remained at the facility and that these agreements are a resource available to residents so as to preclude eligibility for medical assistance. Thus, under the 1986 agreements no new obligation runs from ECC to the residents that would serve as valid consideration for the modified contracts.[6]

> Since petitioner makes no claim that it is unable to comply with the terms of the contract, its residents are clearly ineligible for medical assistance as long as they remain residents at petitioner's facilities. *ECC I*, 89 Pa.Commonwealth Ct. at 270, 492 A.2d at 467.
>
> Because our 1985 decision in *ECC I* was never appealed, that decision's conclusion cannot now be reviewed. *Nunez v. Redevelopment Authority of Philadelphia*, 147 Pa.Commonwealth Ct. 577, 609 A.2d 207 (1992).

5. Because of our disposition of this case, we do not reach this issue.

6. Furthermore, there is no allegation that ECC is *unable* to perform its obligation under the pre–1975 agreements. If ECC demonstrates that it has insufficient assets to provide the necessary care and maintenance to any eligible resident, medical assistance is available. As we stated in *ECC I*, "Since petitioner makes no claim that it is unable to comply with the terms of the contract, its residents are clearly ineligible for medical assistance as long as they remain residents at petitioner's facilities." *Id.* 89 Pa.Commonwealth Ct. at 271, 492 A.2d at 467.

■ Here, the evidence also indicates that in order to induce the residents to sign the 1986 agreements, ECC provided inaccurate information to the residents and their family members about the nature of the dispute between DPW and ECC. The record indicates confusion and misunderstanding on the part of the residents who signed the 1986 agreements as to their true position. Evelyn Graeff, an ECC resident, testified that she understood that the 1986 agreement was being signed because "the state wanted—I don't know, they— the state requested it, I guess you might say, that they changed something." (R.R. at 31a.) Ms. Graeff also testified that it was her understanding that she would not be able to continue staying at the Village if she did not obtain medical assistance benefits. (R.R. at 41a.) In addition to the testimony of Ms. Graeff, ECC sent a letter to Paul Eshenauer on October 22, 1986, regarding the status and prospects of his mother, an ECC resident, which stated in part: "The Pennsylvania Department of Public Welfare has determined that those residents with a pre–1975 contract for service will no longer be eligible for Medical Assistance (Medicaid) benefits as long as these agreements remain in effect ... *The Pa. Dept. of Public Welfare requires this change [in the terminology of the admission agreement] in order for her eligibility status to continue after the end of this year.*" (R.R. at 240a–41a) (emphasis added).

■ DPW quotes *Estate of Evasew,* 526 Pa. 98, 584 A.2d 910 (1990) to support its contention that ECC has not met its burden of proving that the 1986 agreements are valid:

> [I]f in a transaction between the parties who stand in a relationship of trust and confidence, the party in whom the confidence is reposed obtains an apparent advantage over the other, he is presumed to have obtained that advantage fraudulently ... [and] must assume the burden of proof that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious.

*Id.* at 104, 584 A.2d at 912–913 (1990). Because of the relationship between the parties, ECC has the burden of proving that it did not take advantage of its influence or

knowledge and that the 1986 modifications were fair and conscientious. ECC has not met this burden. ECC never told its residents about this court's 1985 decision or that, despite the fact that medical assistance could not be obtained, ECC was still obligated to provide them with care and maintenance as long as they remained residents of ECC and that they could only be dismissed for violation of certain provisions of the pre–1975 contract.[7] Apparently, ECC also failed to tell residents that their previous contracts might have some value.[8] The 1986 agreements served only ECC's interests and provided no real new benefit to the residents whose care and maintenance remained the same, although funded from a different source. *See, e.g., Chatham Communications, Inc. v. General Press Corp.*, 463 Pa. 292, 344 A.2d 837 (1975). ECC, not the state agency, must make the case for any medical assistance reimbursement that may be due to its residents. *Carbondale Nursing Home, Inc. v. Commonwealth, Department of Public Welfare*, 120 Pa.Commonwealth Ct. 186, 548 A.2d 376 (1988). Here, DPW determined that because the 1986 agreements were not valid to avoid ECC's obligations under the pre–1975 agreements, the residents remained ineligible for reimbursement for services under the medical assistance program pursuant to our decision in *ECC I*. Because ECC did not meet its burden of proof, DPW's determination

7. The pre–1975 agreements provided that residents could be dismissed for failure to transfer all assets, governmental benefits or property of any type to ECC, (R.R. at 278a), and that residents could be dismissed for conduct incompatible with the "life and good order and best interests of the Village, for concealment of assets, for making false statements concerning assets, for the transfer of assets to relatives or third parties in anticipation of admission to the Village, for intentional failure to transfer all assets to the Village, or for other valid reasons." (R.R. at 279a.)

8. DPW had suggested to ECC that it could resolve its difficulties with the life-care contracts by buying them out at their then-current actuarial values. (R.R. at 213a.) Assuming that the pre–1975 contracts did have value, the residents had an asset in that value and would be ineligible for medical assistance if that asset were transferred for less than fair consideration. The then-applicable regulation apparently deemed a person ineligible to receive medical assistance if, within two years preceding the application, that person disposed of resources having a value of $500.00 or more without receiving fair consideration. *See* current regulation found at 55 Pa.Code § 178.101(a).

that the pre–1975 agreements continue to control the relationship between ECC and these residents stands. Because these life-care contracts are considered a third-party resource which must be exhausted before the resident is eligible for medical assistance, ECC is not entitled to receive medical assistance for the residents governed by the pre–1975 agreements.

Accordingly, we affirm.

## ORDER

AND NOW, this 11th day of June, 1993, the order of the Pennsylvania Department of Public Welfare Office of Hearings and Appeals, dated March 11, 1992, is affirmed.