### GRACE CENTER COMMUNITY LIVING CORP.

v.

### COUNTY OF INDIANA, White Township, Indiana County Board of Assessment Appeals, and Indiana Area School District.

### Appeal of County of Indiana, White Township and Indiana Area School District.

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2002.

Decided April 10, 2002.

---

Carol Hanna, Indiana, for appellants.

Thomas M. Bianco, Indiana, for appellees.

Before McGINLEY, Judge, SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this appeal from the trial court's grant of a real estate tax exemption, we are asked to decide whether a senior community living home that makes apartments available at cost or less satisfies the constitutional and statutory requirements for charitable tax exemption. We affirm.

The facts are not in dispute. Grace Center Community Living Corporation (Grace Manor) is a non-profit corporation that provides housing to senior citizens in a community environment. It consists of sixteen one and two bedroom housing units, a guest room and a "great room" which contains furniture appropriate for meetings, social events, and leisure activities.

The purpose of Grace Manor is to provide low cost housing to the elderly without government assistance or subsidy.[1]

1. Merle Stilwell, a member of the Board of Directors, testified that "one of the things that

Applicants for residency must meet only two requirements: the resident must be greater than 60 years of age, and must be able to take care of himself or herself. There is an extensive waiting list for residency at Grace Manor. When a unit is available, the Board of Directors starts at the top of the list in search of an individual who is ready to move into the unit. The rental fee for one bedroom unit is $495.00 per month, and the rental fee for a two-bedroom unit is $595.00 per month.

All of the work performed at Grace Manor is on a volunteer basis. Grace Manor has no paid employees and all work, whether maintenance, repair, plumbing, landscaping, office or managerial is provided to Grace Manor through volunteer hours, without any type or compensation. One volunteer alone has worked a minimum of 2000 hours maintaining the landscape with his own equipment.

There are no private shareholders at Grace Manor, nor do any individuals receive a salary, dividends or any other benefits from Grace Manor's net earnings or donations. All excess revenue is placed into an account held for future repairs to

the physical facility, or an extra payment is made on the building loan.[2]

■ Grace Manor requested a real estate tax exemption for the tax year 2000. When the requested exemption was denied by the Indiana County Board of Assessment Appeals, Grace Manor sought review from the trial court. After a hearing, the trial court reversed the Board, thereby granting a charitable tax exemption for Grace Manor. Timely appeal was taken to this Court by the County of Indiana, White Township, and the Indiana Area School District (collectively Taxing Authorities).[3]

■ Section 204 of the General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204, identifies certain property that is exempt from all county, city, borough, town, township, road, poor and school tax. The section includes an exemption for property owned by charities and used for charitable purposes. 72 P.S. §§ 5020–204(a)(3), 5020–204(a)(10). Article VIII, § 2 of the Pennsylvania Constitution, however, limits the exemption to only those organizations which are institutions of purely public charity. *Hospital Utiliza-*

---

lets the corporation or lets the rent be as it is is because the board and neighbors and residents have said we will contribute." Testimony of Merle Stilwell, R.R. at 46a–47a. "An example, the president of the corporation, Dr. Melvin Woodard spends two or three visits a week replacing light bulbs, meeting with residents, requests to take care of small things that we simply can't afford to pay a plumber to come in and do if we are to continue with our desire namely to give nice housing for absolute minimal charge." Testimony of Stilwell, R.R. at 47a.

Ron Lowman, Treasurer of the Board of Directors, testified that the budget is projected to a point where revenues will break even with expenses and an additional figure for future maintenance. Testimony of Ron Lowman, R.R. at 61a–62a.

**2.** Grace Manor's cash flow report for 2000 shows that the net operating budget totaled $117,045.68 with a carryover balance of $4,649.89. R.R. at 98a.

**3.** This Court's scope of review in a tax assessment appeal is limited to a determination of whether the trial court abused its discretion, committed an error of law or whether its decision is supported by substantial evidence. *Wilson Area School District v. Easton Hospital,* 561 Pa. 1, 747 A.2d 877 (2000). The trial court is the fact finder and resolves all matters of credibility and evidentiary weight. Its findings are binding on this Court if supported by substantial evidence. *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review,* 536 Pa. 478, 640 A.2d 380 (1994).

*tion Project v. Commonwealth of Pennsylvania*, 507 Pa. 1, 487 A.2d 1306 (1985).

■ In *Hospital Utilization Project* (hereinafter *"HUP"*), the Pennsylvania Supreme Court set forth the characteristics that an entity must possess to be considered a purely public charity for purposes of Article VIII, § 2. The legislature codified this test and added several additional objective standards in the act commonly known as the Institutions of Purely Public Charity Act (Act 55), Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385. *In re RHA Pennsylvania Nursing Homes,* 747 A.2d 1257 (Pa.Cmwlth.2000). *See Appeal of Sewickley Valley YMCA,* 774 A.2d 1 (Pa.Cmwlth.2001); *The Betsy King LPGA Classic v. Richmond,* 739 A.2d 612 (Pa.Cmwlth.1999). To qualify as an institution of purely public charity, an entity must 1) advance a charitable purpose; 2) operate entirely free from private profit motive; 3) donate or render gratuitously a substantial portion of its services; 4) benefit a substantial and identifiable class of persons who are legitimate subjects of charity; and 5) relieve the government of some of its burden. *HUP. See* § 5(a)—(f) of Act 55, 10 P.S. § 375.

The parties here disagree as to whether the third and fourth prongs of the *HUP* test and the corresponding Act 55 requirements have been met. In addition, the parties dispute whether the Act 55 requirements to establish that an institution

operates entirely free from private profit motive have been satisfied. *See* § 5(c) of Act 55, 10 P.S. § 375(c)(4).[4]

## I.

Taxing Authorities contend that the trial court erred in concluding that Grace Manor donated or rendered gratuitously a substantial portion of its services. In particular, Taxing Authorities contend that Grace Manor must show that it makes a bona fide effort to service primarily those who cannot afford the usual fee.

■ It is clear that an institution which collects fees or charges for its services and absorbs only a fraction of its costs can qualify for tax exemption as a purely public charity. *City of Washington v. Board of Assessment Appeals of Washington County,* 550 Pa. 175, 704 A.2d 120 (1997) (college that charged tuition which covered one-half of its costs qualified for tax exemption as a purely public charity); *St. Margaret Seneca Place v. Board of Property Assessment Appeals and Review,* 536 Pa. 478, 640 A.2d 380 (1994) (nursing home that collected fees for its services and absorbed only one-sixth of its costs qualified for tax exemption as a purely public charity); *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968) (rest home that collected fees from its residents and absorbed only one-fifth of its costs was a purely public charity).

---

4. Taxing Authorities also contend that the trial court committed an error of law by addressing only the Act 55 requirements. Taxing Authorities argue that the trial court impermissibly failed to engage in an express preliminary constitutional evaluation. Unfortunately, Taxing Authorities *did not invite* the trial court to engage in a preliminary constitutional evaluation separate and apart from that required by Act 55, nor was this issue raised in any discernable way before the trial court. *See* Post Trial Brief on behalf of the Indiana County Board of Assess-

ment Appeals, R.R. at 24a–29a. We find no error in the trial court's failure to answer a question that was not asked. *In re RHA* at 1260.

Moreover, the trial court accurately stated the relationship between the constitutional tests enumerated in *HUP* and Act 55. *Compare* Trial Court Op. at 3, —— D & C 4th —— (Dkt. No. 10813 CD 2000, filed April 16, 2001), R.R. at 96a, *with In re RHA* at 1259; *Sewickley Valley YMCA* at 5; *The Betsy King LPGA Classic* at 614, n4.

Instructive is *St. Margaret Seneca Place*. In *St. Margaret Seneca Place*, our Supreme Court reversed this court, thereby allowing a charitable tax exemption, noting that we should have accepted the trial court's finding that the program was not designed to operate at a profit. *St. Margaret Seneca Place*, 536 Pa. at 484, 640 A.2d at 383. The Court concluded that the requirement that an institution donate or render gratuitously a substantial portion of its services does not imply a requirement that the institution forego available government payments which cover part of its costs or that it provide wholly gratuitous services to some of its residents. *Id.*, 536 Pa. at 486, 640 A.2d at 384.

In *Presbyterian Homes*, our Supreme Court held that a rest home qualified for charitable tax-exempt status where many residents paid their way completely and covered eighty percent of the operational costs of the rest homes. The Court stressed that the rest home had never in any year realized a profit and, even more important, if there were profit, it would not go to an individual or to a corporation operated for private profit. *Presbyterian Homes*, 428 Pa. at 153–54, 236 A.2d at 780. Our Supreme Court noted:

'The courts have long recognized and declared that charity is not limited to giving alms, is not confined to relief of the poor, may extend to the rich in areas where they are not able to care for themselves, and extends to those social objectives which promote the general welfare and would be served by the government in the absence of philanthropic enterprises such as homes for the aged. *Historically, and well-nigh unanimously, the courts have found homes for the aged to be charitable institutions where conducted at cost or less.* They have also recognized that man, especially the old, does not live by bread alone; that though he be able to pay for all material wants he nevertheless may be dependent upon his fellow man or the government to protect him from the haunting fear of loss of all his property with resultant poverty, fear of illness or other physical disability overtaking him with no one near to help, fear of the loneliness arising from absence of social contacts, fear of any of the tragedies of old age where there is no one standing by to help.'

*Id.* at 152, 236 A.2d at 779–80 (emphasis added) (citations omitted).

In *Four Freedoms House of Philadelphia, Inc. v. Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971), our Supreme Court held that an apartment house operated by a non-profit corporation to provide low cost housing for the aged was entitled to a charitable real estate tax exemption. Tenants paid rent that covered operational expenses but did not include any margin of profit. "On these facts, the rent charged by appellant is less than the amounts charged by similarly situated, commercial lessors as it merely covers appellant's operational expenses and does not include any margin of profit." *Id.* at 219, 279 A.2d at 157.[5]

---

5. In contrast, our Supreme Court has concluded that a housing project renting units to low and moderate income families below the market rate did not qualify as a purely public charity. *Metropolitan Pittsburgh Nonprofit Housing Corp. v. Bd. of Property Assessment Appeals and Review*, 480 Pa. 622, 391 A.2d 1059 (1978). That housing project did not limit tenancy on the basis of age and did not provide tenants with any physical, emotional or moral services which they would otherwise lack. *Id.* at 627–28, 391 A.2d at 1061–62. The age of residents and provision of additional services were central to the Court's decision.

■ Based on the foregoing authority, we conclude that Grace Manor meets the constitutional requirement for donating a substantial portion of its services. Providing senior living in a community atmosphere at cost or less satisfies the requirement that a charity donate or render gratuitously a substantial portion of its services.[6]

Moreover, we agree with the trial court's conclusion that Grace Manor satisfies the statutory requirement of donating or rendering gratuitously a substantial portion of its services. Section 5(d)(1) of the Act, 10 P.S. § 375(d)(1). This criterion is satisfied if the institution benefits the community by actually providing any one of a number of goods of services, including "uncompensated goods or services which in the aggregate are equal to at least five percent of the institution's costs of providing goods or services." Section 5(d)(1)(v) of Act 55, 10 P.S. § 375(d)(1)(v). Subsequent statutory provisions explain how uncompensated goods and services can be valued. Section 375(d)(4)(vi) provides that the term "uncompensated goods or services" shall include the reasonable value of volunteer assistance which, computed on an hourly basis, shall not exceed the Statewide average weekly wage as defined in section 105.1 of the Workers' Compensation Act,[7] divided by 40. *See* Section 5(d)(4)(vi), 10 P.S. § 375(d)(4)(vi). Here, the trial court concluded that the value of volunteer services exceeded the statutory threshold. Trial Court Op. at 8–9, R.R. at 101a–02a. As this finding is supported by substantial evidence, including the evidence previously noted, we may not disturb it. *St. Margaret Seneca Place.*

## II.

Taxing Authorities also contend that Grace Manor failed to satisfy the constitutional and statutory requirement that the institution benefit a substantial and indefinite class of persons who are legitimate subjects of charity.

Our Supreme Court has recognized that care of the aged has been considered charitable for centuries.

> The elderly, even those who are not completely incapacitated physically, suffer from loneliness, and from mental and physical infirmities which tend to increase as they grow older and their children leave the family home and their contemporaries move away or die. With each passing year, they usually become less and less able to cope with the day-to-day problems of life, including the management of their homes, their proper maintenance and support, and even, at times, their adequate nourishment; and they often live in fear and dread of illness or of some physical disability or possible poverty, or of just plain inability to adequately take care of themselves. It is certainly in the public interest and public welfare that homes and other facilities be established and maintained to relieve these worries and anxieties, these fears and sufferings, and this well-known inability of the aged to adequately care for themselves.

*Presbyterian Homes,* 428 Pa. at 151, 236 A.2d at 779. Thus, we recognize that our senior citizens are appropriate objects of charity not solely on the basis of financial

---

6. Taxing Authorities rely on decisions from this Court. *E.g., Appeal of Capital Extended Care,* 148 Pa.Cmwlth. 128, 609 A.2d 896 (1992). However, we believe the constitutional analysis consistently used by our Supreme Court is dispositive here.

7. Section 105.1 of the Act of June 2, 1915, P.L. 736, *added by* section 3 of the Act of March 29, 1972, P.L. 159, 77 P.S. § 25.1.

need but also on the basis of emotional, social and physical challenges which increase with age. Stated differently, senior citizens are the proper objects of charity as a result of all the special needs associated with their age.

█ By providing a community living environment for senior citizens at or below cost, Grace Manor seeks to benefit a substantial and indefinite class of persons who are legitimate subjects of charity. In an attempt to address the social concerns of loneliness and isolation, Grace Manor offers community living. Also, in an attempt to address concerns arising from physical challenges, Grace Manor offers support in case of sudden disability.[8] That these benefits are offered at or below cost, without any attempt to generate a profit, satisfies the constitutional and statutory tests.

### III.

Finally, Taxing Authorities contend that Grace Manor failed to prove that it satisfied the statutory requirement of operating free from private profit motive because it failed to submit a copy of the corporation's

bylaws containing a provision that expressly prohibits the use of any surplus funds for private inurement to any person in the event of dissolution as required by Section 5(c)(4) of Act 55, 10 P.S. § 375(c)(4).[9]

Grace Manor did not submit a copy of the corporation's by-laws containing such a dissolution provision. Although Board member Merle Stilwell testified that such a by-law had been adopted, he could not find a copy of the minutes of the meeting in which the dissolution provision was adopted. In addition, Stilwell stated that the Grace Manor Board of Directors intended the dissolution provision of the federal tax-exempt application to be binding on the corporation, which would never gain any monetary benefit upon dissolution. Trial Court Op. at 5, R.R. at 98a.

In support of the testimony that a dissolution clause existed, Grace Manor submitted its Application for Recognition of Exemption under 501(c)(3) of the Internal Revenue Code. The exhibit states:

In the event of dissolution of the Corporation, the by-laws provide that its assets shall be distributed either: 1) to

---

**8.** Resident Marsha Ludwig testified, "I really felt that if I needed somebody, they would be there and it was a proved fact within about five months I had a bad accident and these people totally took over and helped me for a good year and a half." R.R. at 71a.

**9.** Section 5(c) of Act 55, 10 P.S. § 375(c), requires that an institution operating entirely free from private profit motive to do so an institution must meet the following statutory test:

(c) Private profit motive.—The institution must operate entirely free from private profit motive. Notwithstanding whether the institution's revenues exceed its expenses, this criterion is satisfied if the institution meets all of the following:

(1) Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals, as the private inurement standard is interpreted under section 501(c)(3)

of the Internal Revenue Code of 1986 (Public Law 99–514, 26 U.S.C. § 501(c)(3)).

(2)The institution applies or reserves all revenue, including contributions, in excess of expenses in furtherance of its charitable purpose or to funding of other institutions which meet the provisions of this subsection and subsection (b).

(3) Compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution.

(4) The governing body of the institution of purely public charity has adopted as part of its articles of incorporation or, if unincorporated, other governing legal documents a provision that expressly prohibits the use of any surplus funds for private inurement to any person in the event of a sale or dissolution of the institution of purely public charity.

Grace United Methodist Church; 2) the United Methodist Foundation of Western Pennsylvania; or 3) another charitable organization organized for similar purposes and having 501(c)(3) tax exemption. This provision is mandated by Treasury regulation § 1.501(c)(3)-(1)(b)(4), and may not be removed without risking the loss of the Corporation's tax exempt status under § 509(a)(3).

Trial Court Op. at 5–6, R.R. at 98a–99a. *See* R.R. at 49a–50a, 110a. Grace Manor's application for tax exemption was approved by the Internal Revenue Service. The President and Treasurer of the Board of Directors signed the tax exempt application. Stilwell testified that this document was attached to Grace Manor's 501(c)(3) application and does represent Grace Manor's current by-laws. The trial court found the testimony to be credible as to the existence of a dissolution clause. Trial Court Op. at 7, R.R. at 100a.

■ The trial court noted that the first three aspects of the statutory tests were clearly satisfied, but that Grace Manor submitted no legal document incorporating a provision prohibiting use of any surplus funds for private benefit in the event of a sale or dissolution of the institution. However, the trial court accepted the testimony of witnesses who established that while such a document existed, it could not be located. *See* Pa. R.E. 1004. This finding is binding on this court, and it disposes of this issue. *St. Margaret Seneca Place. Cf. In re RHA* (nursing home's articles of incorporation prevented use of surplus funds for private benefit, although no single article followed language of Act 55).

For the foregoing reasons, we affirm the decision of the Court of Common Pleas of Indiana County. Accordingly, Grace Manor is granted tax-exempt status for the year 2000.

## ORDER

AND NOW, this 10th day of April, 2002, the Order of the Court of Common Pleas of Indiana County is affirmed.