**MENNO HAVEN, INC., d/b/a Menno Village and Menno Haven Penn Hall, Inc., d/b/a Penn Hall, Appellants**

v.

**The FRANKLIN COUNTY BOARD OF ASSESSMENT AND REVISION OF TAXES, Franklin County, The Borough of Chambersburg and The Chambersburg Area School District.**

Commonwealth Court of Pennsylvania.

Argued Dec. 14, 2006.

Decided March 7, 2007.

Donald R. Reavey, Harrisburg, for appellants.

Welton J. Fischer, Chambersburg, for appellee, The Franklin County Board of Assessment and Revision of Taxes.

Shawn D. Meyers, Mercersburg, for appellee, Franklin County.

Thomas J. Finucane, Chambersburg, for appellee, Borough of Chambersburg.

Jan G. Sulcove, Chambersburg, for appellee, Chambersburg Area School District.

BEFORE: FRIEDMAN, Judge, and KELLEY, Senior Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Menno Haven, Inc. d/b/a Menno Village and Menno Haven Penn Hall, Inc. d/b/a Penn Hall (hereinafter collectively referred to as "Menno Haven") appeals from

an order of The Court of Common Pleas of the Thirty–Ninth Judicial District, Franklin County Branch (trial court) dismissing Menno Haven's appeal and affirming the decision of the Franklin County Board of Assessment and Tax Revision (Board) finding Menno Haven's skilled nursing facilities taxable. We affirm.

Menno Haven operates two continuing care retirement communities (CCRC) known as Menno–Haven, Inc. (hereinafter referred to as "Menno Haven Scotland") and Menno Haven Penn Hall, Inc. (hereinafter referred to as "Penn Hall"). These two facilities are licensed by the Department of Insurance and share one license. Both facilities offer three levels of care: (1) independent living which is designed for individuals who are able to independently care for themselves; (2) assisted living which is designed for individuals who are unable to fully care for themselves at the independent living level; and (3) skilled nursing which is designed for individuals who need constant medical supervision and care. Menno Haven's current population is approximately 1300 residents.

The skilled nursing level of care at both facilities is at issue in this appeal. The skilled nursing facilities have been tax exempt since the time of their construction in 1967. In 2001, Menno Haven sought a tax exemption for its independent living and assisted living facilities, which litigation is still pending. Thereafter, the Chambersburg Area School District, the Borough of Chambersburg, Franklin County and Greene Township (hereinafter referred to as "Taxing Authorities") determined that

the skilled nursing facilities no longer qualify for real estate tax exemption and initiated proceedings to revoke their tax-exempt status. A hearing was held before the Board on October 18, 2004, after which the Board found that the skilled nursing facilities were taxable. Menno Haven appealed to the trial court.

Upon review, the trial court found that Menno Haven did not satisfy the five part "*HUP* test" set forth by our Supreme Court in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985), because Menno Haven did not donate or render gratuitously a substantial portion of its services and did not benefit a substantial and indefinite class of persons who are legitimate objects of charity. The trial court also determined that Menno Haven did not satisfy the requirements of the Institutions of Purely Public Charity Act[1] (Act 55) as Menno Haven did not donate or render gratuitously a substantial portion of its services. Finally, the trial court rejected Menno Haven's arguments that: (1) it did not have proper notice of the October 18, 2004 hearing before the Board; (2) it should be permitted to retain its tax-exempt status based on equitable estoppel; and (3) it is being treated differently from other non-profit skilled nursing facilities located in the community. Accordingly, the trial court dismissed Menno Haven's appeal and affirmed the Board. This appeal followed.[2]

An institution seeking a real estate tax exemption bears a heavy burden. *Guthrie Clinic, Inc. v. Sullivan County*

1. Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385.

2. This Court's scope of review in a tax assessment appeal is limited to a determination of whether the trial court abused its discretion, committed an error of law or whether its decision is supported by substantial evidence.

*Grace Center Community Living Corporation v. County of Indiana*, 796 A.2d 1008 (Pa. Cmwlth.2002). The trial court is the fact finder and resolves all matters of credibility and evidentiary weight. *Id.* Its findings are binding on this Court if supported by substantial evidence. *Id.*

*Board of Assessment Appeals,* 898 A.2d 1194 (Pa.Cmwlth.2006). Article 8, Section 2(a)(v) of the Pennsylvania Constitution provides that the General Assembly may by law exempt from taxation institutions of purely public charity. Pa. Const. Art. VIII, § 2(a)(v). "An entity seeking a statutory exemption for taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Community Options, Inc. v. Board of Property Assessment, Appeals and Review,* 571 Pa. 672, 676, 813 A.2d 680, 683 (2002); *see also American Law Institute v. Commonwealth,* 882 A.2d 1088, 1090–91 (Pa.Cmwlth.2005), *aff'd,* 587 Pa. 589, 901 A.2d 1030 (2006) (Because the Pennsylvania Constitution itself does not exempt a taxpayer from taxation, but rather permits the General Assembly to do so within limits, an entity seeking or defending a tax exemption must first establish that it is a purely public charity within the meaning of Article VIII, Section 2 by meeting the minimum constitutional qualifications set forth in *HUP,* and second that it meets the statutory qualifications for exemption under Section 5 of Act 55, 10 P.S. § 375).

■ Accordingly, this Court must first determine whether the trial court erred when it determined that Menno Haven did not qualify as a purely public charity under the *HUP* test. Pursuant to *HUP,* 507 Pa. at 22, 487 A.2d at 1317, an entity qualifies as a purely public charity under Article VIII, Section 2 if it possesses the following characteristics:

1. Advances a charitable purpose;

2. Donates or renders gratuitously a substantial portion of its services;

3. Benefits a substantial and indefinite class of persons who are legitimate objects of charity;

4. Relieves government of some of its burden; and

5. Operates entirely free from private profit motive.

Herein, the trial court found that Menno Haven did not satisfy the second or third prongs of the *HUP* test. We will first address Menno Haven's argument that the trial court erred by determining that it failed to meet the second *HUP* factor as such determination is inconsistent with the law and not supported by substantial evidence.

Initially, this Court notes that Menno Haven goes to great lengths to show how the trial court erred in finding that it did not satisfy the requirements of Act 55 and how Menno Haven did in fact prove that it satisfied the criterion required by Section 5 of Act 55. *See* Section 5 of Act 55, 10 P.S. § 375. With respect to the second prong of the *HUP* test, Menno Haven requests that this Court consider Menno Haven's satisfaction of the criterion required for the second prong of the Act 55 test as simultaneous satisfaction of the *HUP* constitutional test. We decline based on Supreme Court's decision in *Community Options* which, as set forth previously herein, clearly holds that "[a]n entity seeking a statutory exemption for taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Community Options,* 571 Pa. at 676, 813 A.2d at 683.

■ Menno Haven first challenges the trial court's finding that Menno Haven reserves a portion of an individual's entrance fee to its independent living level of care for later care at the skilled nursing facili-

ties arguing that the finding is not based on substantial evidence.[3] Menno Haven argues that the entire underpinning of the trial court's ultimate conclusion that Menno Haven is not a purely public charity is based on its misconceptions regarding the entrance fees to Menno Haven's independent living units. Menno Haven argues that it does not specifically reserve surplus revenue generated from a specific individual to later care for that specific individual in its nursing homes. Menno Haven contends that instead, all surplus revenue is placed into Menno Haven's general fund to be used to make up for shortfalls realized by caring for Medicaid residents in its skilled nursing facilities.

Herein, due to Menno Haven's accounting practices, corporate set up, and the availability of the residents to transfer between facilities, the trial court analyzed Menno Haven Scotland and Penn Hall as if they were one entity. The trial court found, based on the testimony of Menno Haven's Chief Financial Officer David Bishop, that Menno Haven has a financial admission policy that is typically followed and enforced whenever Menno Haven is reviewing an application for admission submitted by an individual from the community at large. This policy requires an applicant to be able to satisfy the financial admission criteria. Applicants for the independent living level of care must have sufficient resources available to pay: (1) the full cost of the entrance fee which ranged from $45,000 to $225,000 in 2004 depending on the unit chosen; (2) the monthly service fees and other personal living expenses for two years; and (3) the per diem rate for a minimum of two years in assisted living.

An applicant for assisted living must have sufficient available resources to pay the daily per diem rate for a minimum of four years.[4] The per diem rate is based on the current rate plus a 5% increase compounded for each expected future year of care. An applicant for skilled nursing care must have financial resources adequate to meet the per diem rate for one and a half years.[5] Residents admitted to a skilled nursing facility from another level of care within the Menno Haven community are not subject to the financial criteria. Adult Day Care clients are given priority on the waiting list over the non-resident community upon meeting the financial criteria.

Mr. Bishop testified that the entrance fee consists of a partially refundable life lease payment and an interest-free loan repayable (without interest) upon vacating the unit by death of the resident or transition to another level of service. The entrance fee is non-refundable in the event that an occupant dies following the third year of residency. The entrance fee does

3. Menno Haven raises the issue, in the argument portion of its brief, of whether the trial court erred by preparing its opinion without the benefit of a trial transcript and by not ordering the parties to file formal findings of fact and conclusions of law. Menno Haven contends that the foregoing error by the trial court may have led to some clear factual errors which may have been prevented had the trial court had the benefit of a trial transcript and formal findings and conclusions of law. However, Menno Haven failed to raise this issue in it Statement of Questions Involved. Therefore, the Court will not consider this issue. *See* Pa.R.A.P. 2116(a) (Ordinarily, no point will be considered which is not set forth in the statement of questions involved or suggested thereby.).

4. For 2004, in order to meet the financial admission policy, an applicant for the assisted living level of care needed resources equal to at least $128,480 for a level 1, single occupancy room.

5. For 2004, an applicant for the skilled nursing level of care needed resources equal to at least $100,192 to $107,857 to be considered for admission.

not give the resident an ownership interest in the unit. The trial court found that instead, the entrance fee gives the resident a guarantee of continuing medical care should his/her medical condition necessitate skilled nursing services.

The trial court found, based on the testimony of Leon LeBreton, Menno Haven's financial expert, that a portion of the entrance fee is actuarially determined to be available for application to the excess medical costs associated with an independent living unit resident that transitions to a skilled nursing facility. *See* Reproduced Record (R.R.) at 1478a. The trial court noted that Menno Haven did not offer any testimony about what percent of the entrance fee is apportioned for this purpose. The trial court also found, based on Mr. LeBreton's testimony, that the entire entrance fee is put into a general fund and that no amount is set aside as a reserve to be available to cover excess medical costs. Mr. LeBreton testified that Menno Haven does not allocate any of the entrance fees toward nursing home, Medicare, Medicaid, or nursing home care on Medicaid. *Id.* Mr. LeBreton testified further that the excess would be used to make up the shortfall on Medicaid. *Id.* Therefore, the trial court found that the entrance fee is put into a general fund and that no amount is set aside as a reserve to be available to cover excess medical costs.

Thus, while the trial court couched one of its finding in terms of an individual resident, it is clear from the trial court's opinion that it understood that it is Menno Haven's policy to collect in advance, through the imposition of an entrance fee, for medical services that it thinks it may have to render in the future without compensation. It is also clear from the trial court's opinion that it understood that the revenues from the entrance fees are placed into Menno Haven's general fund. Ac-

cordingly, we reject Menno Haven's argument that the trial court's misconceptions regarding the entrance fees to Menno Haven's independent living units led to an erroneous conclusion that Menno Haven is not a purely public charity.

Next, Menno Haven challenges the trial court's finding that it is contractually bound to admit its residents into a skilled nursing facility regardless of ability to pay because in exchange for paying the entrance fee, the resident received a promise of guaranteed admittance into the skilled nursing facility. Menno Haven argues that the trial court's finding is based upon a misinterpretation of Mr. LeBreton's testimony.

Menno Haven argues further that the contractual language of the admission documents for the independent living care level does not contain any provisions that suggest an obligation on the part of Menno Haven to provide skilled nursing care to independent living residents. Menno Haven contends that instead, the contracts clearly state that Menno Haven is not required to provide skilled nursing care but will make every effort to make it available on a priority basis at the then prevailing per diem rates. Menno Haven contends further that if it was truly contractually bound to provide skilled nursing care to its current residents via the admission contract, said contract would then become a life care contract resulting in the residents being ineligible for Medicaid. *See ECC Retirement Village v. DPW,* 157 Pa.Cmwlth. 20, 629 A.2d 1046 (1993) (Holding that, under DPW regulations, life care contracts or contracts guaranteeing maintenance wherein an individual agrees to transfer all assets or property to an institution and in return the institution guarantees that it will provide complete maintenance either for life or for a speci-

fied period renders an individual ineligible for medical assistance.).

With respect to Mr. LeBreton's testimony, as set forth previously herein, we conclude that the trial court did not misinterpret that testimony or take it out of context. Mr. LeBreton, who was Menno Haven's financial expert, clearly testified that Menno Haven makes an agreement to have continuing care for a resident when they enter the skilled nursing facility and if they cannot pay, Menno Haven does not discharge that resident. R.R. at 1478a. Mr. LeBreton testified further that one of the reasons for the entrance fee is to provide revenue to cover potential nursing home care for people who run out of money. *Id.* Moreover, Menno Haven does not dispute the fact that they do not discharge a resident for inability to pay.

This Court agrees with Menno Haven that the contractual language to which they refer does not contractually bind them to provide skilled nursing care to its independent living residents. However, the record evidence also supports the trial court's determination that Menno Haven has agreed to provide continuing care for a resident and it permits a resident to transition to a skilled nursing facility regard-

less of that resident's ability to pay on a per diem basis because of its obligation to provide continuing care rather than a sense of charity or out of a bona fide effort to service those that cannot afford the usual fee.[6] Moreover, Menno Haven's argument that it is not contractually bound to provide skilled nursing services but instead may refuse admission to a resident within its own community if that resident is unable to pay the per diem rate at the time of application, only supports the trial court's ultimate determination that Menno Haven does not donate or render gratuitously a substantial portion of its services.

Menno Haven next challenges the trial court's finding that the average percentage of Medicaid residents to private paying residents at its skilled nursing facilities was 25% arguing that this finding is also not supported by substantial evidence. Menno Haven contends that Mr. Bishop clearly testified that, in 2003 and 2004, the percentage of Medicaid residents it cared for in its skilled nursing facilities hovered just below thirty percent. Menno Haven contends that the trial court's finding of 25% is based on a misinterpretation of the Taxing Authorities' exhibits TA–42A [7] and TA–6.[8]

---

**6.** The contractual language referred to by Menno Haven reveals that it does offer to its residents priority access to its skilled nursing facilities in the event of illness or need for such services. *See* R.R. at 2320a. The language further states that a request for admission to its skilled nursing facilities by an existing Menno Haven resident will be given preference over all other pending applications from non-Menno Haven residents, that the resident will not be charged an admission fee, and that the resident will be charged on a fee-for-services basis consistent with rates in effect during the time of the resident's stay. *Id.* Finally, the contract language states that Menno Haven shall not be required to admit a resident to one of its skilled nursing facili-

ties if a bed is not available at the time of application. *Id.*

**7.** R.R. at 1604a–1065a. Exhibit TA–42–A is a document having the caption "New MA residents from January 1, 2000 through December 31, 2004" with identifying dots. *Id.* at 1507a.

**8.** R.R. at 1536a–1541a. Exhibit TA–6 is a computer listing of names and related information for individual residents at Menno Haven for the period from January 1, 2004 through December 31, 2004, attached to which is a similar computer printout identifying residents of Penn Hall for the same period. *Id.* at 1506a.

Herein, the trial court determined that at most, Menno Haven's current population is 25–28% Medicaid eligible. This finding was based on the trial court's determination that between 2000 and 2004, there were 59 out of 233 skilled nursing residents who were on Medicaid. Although Menno Haven concedes that the Taxing Authorities exhibit TA–42A identifies 59 individuals between 2000 and 2004 who are considered Day One Medicaid eligible,[9] Menno Haven argues that the document does not identify the percent of Medicaid residents at any given time at Menno Haven. However, the Court notes that Menno Haven did not submit any of its own calculations to the trial court. Instead, Menno Haven relied upon the testimony of Mr. Bishop who did testify that the percentage of actual Medicaid residents in Menno Haven's skilled nursing facilities for 2003 and 2004 "was approximately below 30 percent." R.R. at 1358a. The trial court was free to accept or reject Mr. Bishop's testimony in whole or in part and accept other evidence of record such as the information contained in the Taxing Authorities' exhibits which were properly submitted into evidence.

The trial court did accept Mr. Bishop's testimony with regard to the number of residents admitted between 2000 and 2004 from outside the Menno Haven community and who were Day One Medicaid eligible at the time of their admittance. With respect to this determination, the trial court found that between 2000 and 2004, only 25 out of 179 individuals entering the skilled nursing facility, which is approximately 14%, were from outside the Menno Haven community. This finding is supported by Mr. Bishop's testimony. *Id.* at 1407. Mr. Bishop, when testifying as to the information contained on the Taxing Authorities' exhibit TA–42A, testified that there was a total of 25 residents admitted that were Medicaid eligible. *Id.* at 1407a. This figure represented 15 residents who were Day One Medicaid eligible and 10 who were eligible Medicaid residents. *Id.* Thus, this testimony supports the trial court's finding that under the most generous interpretation of the definition of Day One Medicaid eligible, only 15 of those 25 admissions were Day One Medicaid eligible; therefore, approximately 8% of the total admissions between 2000 and 2004 (15 out of 179) were Day One Medicaid eligible from outside of the. Menno Haven community.

Menno Haven also takes issue with the trial court's reliance on the Taxing Authorities' exhibit TA–6 for its finding that during 2004, only 7 out of 194 residents at Menno Haven Scotland, which is approximately 3.6%, were Medicaid eligible, with the remainder being private pay or Medicare eligible. *See* R.R. at 1536a–1541a. The trial court also found, based on exhibit TA–6, that during 2004, there were no Day One Medicaid eligible patients at Penn Hall. Menno Haven contends that exhibit TA–6 only pertains to Day One Medicaid eligibles who were admitted in 2004 and again contends that the figures therefore do not address the average Medicaid population at any given time.

With respect to exhibit TA–6, the Court first notes that Menno Haven did not object to the admission of this document into evidence. *Id.* at 1506a–1507a. Second, as stated previously herein, Menno Haven chose not to present its own calculations to the trial court. Third, as the Taxing Au-

---

**9.** "Day One Medicaid eligible" is defined as an individual who is eligible for nursing facility services under the Commonwealth's Medicaid program, or becomes eligible for nursing facility services under the Commonwealth's Medicaid program within sixty days of the date of the individual's admission to a nursing facility. 55 Pa.Code § 1187.21a(g)(I).

thorities sought to include Menno Haven's skilled nursing facilities on the tax rolls beginning in the 2005 tax year, consideration by the trial court of certain statistics from 2004 was entirely proper in order to determine whether Menno Haven qualified as a purely public charity.

Accordingly, we conclude that the trial court did not improperly determine, based on the record, the number of Medicaid eligible residents residing at Menno Haven for the period between 2000 and 2004. Even assuming that the correct figure is closer to 30%, the trial court still correctly concluded that Menno Haven failed to satisfy the requirement that it donate or render gratuitously a substantial portion of its services.

As sole support for its position that it did satisfy the foregoing requirement based on the "close to 30%" figure, Menno Haven points to our Supreme Court's decision in *In Re: St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review*, 536 Pa. 478, 640 A.2d 380 (1994), wherein the court held that the second prong of the *HUP* test was satisfied where over 48% of the facilities residents were receiving Medicaid. Menno Haven contends that since it cared for just below 30% in its skilled nursing facilities, it cares for a substantial number of Medicaid residents as in *In Re: St. Margaret Seneca Place.* In addition, Menno Haven contends that it suffered a loss of $839,945 by caring for individuals who were Medicaid recipients and the trial court conceded that Menno Haven loses money by caring for Medicaid recipients.

With regard to Menno Haven's reliance on *In Re: St. Margaret Seneca Place*, the trial court determined that the situation herein was not comparable to the situation in that case. We agree.

As pointed out by the trial court, Menno Haven charges a hefty entrance fee and primarily services residents from within the Menno Haven community. The trial court also pointed out that Menno Haven's current population that is Medicaid eligible is far less than that maintained by St. Margaret Seneca Place which had a population that was 48.5% Medicaid eligible and that most of that population was admitted from the community at large. Accordingly, we conclude, as did the trial court, that *In Re: St. Margaret Seneca Place* is quite different from Menno Haven; therefore, the holding in *In Re: St. Margaret Seneca Place* is not controlling in this matter.[10]

Moreover, the fact that Menno Haven loses money by caring for Medicaid patients in its skilled nursing facilities is of no moment where there is a finding, based on substantial evidence of record, that an entity does not donate or render gratuitously a substantial portion of its services. In the present case, the trial court, in a very well reasoned opinion, recognized that the facts and circumstances of a case determine whether a contribution satisfies the "substantial" requirement. As noted by our Supreme Court in *HUP*:

> Whether or not the portion donated or rendered gratuitous is "substantial" is a determination to be made based on the totality of circumstances surrounding the organization. The word "substantial" does not imply a magical percent-

---

10. As recently pointed out by this Court, "[i]n determining whether an institution is one of purely public charity prior cases have limited value as precedent because of the continually changing nature of the concept of charity and the variable circumstances of time, place, and purpose." *American Law Institute*, 882 A.2d at 1091 (citing *City of Washington v. Board of Assessment Appeals*, 666 A.2d 352 (Pa. Cmwlth.1995), *aff'd*, 550 Pa. 175, 704 A.2d 120 (1997)).

age. It must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the "usual fee."

*HUP*, 507 Pa. at 19 n. 9, 487 A.2d at 1315 n. 9.

Based on the totality of the circumstances, the trial court determined that Menno Haven does not donate or render gratuitously a substantial portion of its services. As stated previously herein, the trial court determined that Menno Haven charges a hefty entrance fee and is caring for the Medicaid eligible residents that come from within the Menno Haven community because of an obligation to do so rather than a sense of charity or out of a bona fide effort to service those that cannot afford the per diem rate. The trial court found further that Menno Haven only accepts a small percentage of Day One Medicaid eligible individuals from outside the Menno Haven community; specifically 15 out of 179 individuals for the period between 2000 and 2004.

This Court notes that other than the findings of fact challenged by Menno Haven as previously discussed herein, Menno Haven does not dispute the trial court's remaining findings. Having rejected Menno Haven's challenges to the trial court's findings, we conclude that the trial court's determination that Menno Haven does not donate or render gratuitously a substantial portion of its services is based on substantial evidence.

■ Next, Menno Haven argues that the trial court erred by determining that Menno Haven failed to meet the third *HUP* factor, namely that it benefits a substantial and indefinite class of individuals, as such finding is not supported by substantial evidence. Menno Haven argues that the enumerated Act 55 criteria for determining this factor are not inconsistent with the same *HUP* factor. There-

fore, Menno Haven argues that, as the trial court found that Menno Haven met this factor under Act 55, the trial court should have found that Menno Haven also satisfied the corresponding third *HUP* factor. Finally, Menno Haven contends that much of the trial court's findings that Menno Haven failed to meet this *HUP* factor are based on factual inaccuracies.

Again, we remind Menno Haven that "[a]n entity seeking a statutory exemption for taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached." *Community Options*, 571 Pa. at 676, 813 A.2d at 683. Thus, we decline to conclude that since the trial court found that Menno Haven satisfied the requirements of Act 55, it simultaneously satisfied the corresponding factor set forth in the *HUP* test. Accordingly, we must first determine whether Menno Haven qualifies as a purely public charity under the third prong of the *HUP* test.

Herein, the trial court determined that Menno Haven did not benefit an indefinite class of people. The trial court found that a person from outside of the Menno Haven community only gains access to the services offered by Menno Haven if that person: (1) has sufficient financial resources to meet the financial requirements for admission; (2) is Medicare eligible; or (3) applies at a time when Menno Haven is willing to accept a Day One Medicaid eligible person from outside of the Menno Haven community. The trial court found further, after reviewing the statistics related to Menno Haven's admissions between 2000 and 2004, that Menno Haven did not in actuality very often admit a Day One Medicaid eligible person from outside the Menno Haven community. Therefore, the trial court found that Menno Haven pri-

marily caters to "well-to-do-elderly" and to those already within their community.

The trial court also found that while Menno Haven may serve some legitimate objects of charity, there typically is not a charitable intent behind this decision. The trial court found that Menno Haven has a low population of Medicaid recipient residents, specifically between 25% and 28%. The trial court found further that Menno Haven does not have a charitable intent in serving those clients because it has already received a large amount of fees, including a hefty entrance fee, from the residents. Accordingly, the trial court found that Menno Haven failed to meet this part of the *HUP* test and did not qualify as a purely public charity.

Menno Haven contends that the trial court's findings are based on the same factual inaccuracies that the trial court relied on in finding that Menno Haven did not donate or render gratuitously a substantial portion of its services. However, as discussed herein, we rejected Menno Haven's arguments in that regard and do so again for the same reasons with respect to the third prong of the *HUP* test.

Accordingly, having determined that the trial court did not err in finding that Menno Haven did not satisfy the second and third prongs of the *HUP* test, we need not address whether the trial court erred in finding that Menno Haven did not meet the requirements of Act 55. *Community Options.*

Finally, Menno Haven argues that the trial court erred by determining that Menno Haven is being treated in uniformity under the Pennsylvania Constitution to its peer facility in the county. Menno Haven argues that it produced evidence which undeniably demonstrates that it is not being treated in uniformity to Quincy United Methodist Home.

As correctly pointed out by the trial court, in order to prevail on this argument, Menno Haven must prove that the chief assessor acted systematically, deliberately, and purposefully to discriminate against it. *Fisher Controls Co. v. Commonwealth,* 476 Pa. 119, 381 A.2d 1253 (1977). We agree with the trial court that there is no record evidence to support a finding that Menno Haven satisfied its burden in this regard.

The trial court's order is affirmed.

## ORDER

AND NOW, this 7th day of March, 2007, the order of The Court of Common Pleas of the Thirty–Ninth Judicial District, Franklin County Branch in the above-captioned matter is affirmed.