# Salvation Army *v.* Allegheny County, Appellant.

374

Argued March 22, 1951. Before DREW, C. J., STERN, STEARNE, BELL, LADNER and CHIDSEY, JJ.

*Edward G. Bothwell,* First Assistant County Solicitor, with him *Nathaniel K. Beck,* County Solicitor, *Anne X. Alpern,* City Solicitor, *Bennett Rodgers,* First Assistant City Solicitor, *Mortimer B. Lesher,* School Solicitor and *Oscar G. Peterson,* Assistant School Solicitor, for appellants.

*William H. Eckert,* with him *George M. Swan, Smith, Buchanan & Ingersoll* and *Alter, Wright & Barron,* for appellee.

OPINION BY MR. CHIEF JUSTICE DREW, May 21, 1951:

The Incorporated Trustees of the Salvation Army in Pennsylvania, plaintiff, brought this bill in equity to have certain real estate owned by it adjudged tax exempt as a charity and to enjoin defendants, the

County of Allegheny, the City of Pittsburgh, and the School District of the City of Pittsburgh, from levying and collecting taxes on that property. The learned court below granted the relief prayed for and these appeals followed.

Plaintiff is a non-profit corporation organized and existing under the laws of this Commonwealth and admittedly is an institution of benevolence and charity. The property, which is the subject-matter of this action, is owned by plaintiff and is located at the corner of the Boulevard of the Allies and Cherry Way in the City of Pittsburgh. Upon this property is erected a steel and brick building, in part eight and in part nine stories high. The basement of this building contains a swimming pool, a gymnasium, locker room, boiler room and storage spaces. The first three floors have been set aside for the Pittsburgh offices of the Salvation Army and for the auditoriums, classrooms, workshops and other such rooms needed for the work of that organization. On the fourth to the eighth floors the Salvation Army maintains its "Evangeline Residence", consisting of 229 sleeping rooms, a dining room which is operated exclusively for the residents of the building and the officers of the Salvation Army, a lounge and other rooms. A laundry is maintained on the ninth floor for the convenience of the occupants of the Residence, and the remaining space on that floor is devoted to the modest living quarters of a Salvation Army officer. On the theory that the "Evangeline Residence" constitutes a commercial use of that part of the building occupied by it, the Board of Property Assessment, Appeals and Review assessed the entire property at fifty per centum of its value, and defendants levied taxes on the property at that assessed value. The learned court below enjoined the collection of these taxes on the ground that the Residence was a charity and, therefore, tax exempt under Section 204 of the General

County Assessment Law, the Act of May 22, 1933, P. L. 853, as amended by the Act of May 3, 1943, P. L. 158[1].

The sole question raised is whether the Residence is a purely public charity and thereby that portion of plaintiff's building occupied by it exempted, as is the remainder of the property, from taxation under the Act of 1933, as amended. The test for resolving that issue is laid down in *Y.M.C.A. of Germantown v. Phila.*, 323 Pa. 401, 409, 187 A. 204, where we said: "In all our decisions on this subject there can be discerned as a prerequisite to the taxation exemption of an institution claiming to be benevolent or charitable that it, or the portion of its property, in respect to which exemption is claimed, must possess an eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit. What is 'given' must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered. There must be facts which justify a finding that the 'actual use and occupation' of the

---

[1] "The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit . . (c) All . . . institutions of learning, benevolence, or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose: . . . (1) . . . Except as otherwise provided in clause (k) of this section, all property, real or personal, other than that which is in actual use and occupation for the purposes specified in this section, and all such property from which any income or revenue is derived, other than from recipients of the bounty of the institution or charity, shall be subject to taxation, except where exempted by law for State purposes, and nothing herein contained shall exempt same therefrom . . ."

premises is primarily for the designated charitable object and not largely for commercial purposes."

The chancellor made numerous findings of fact, all of which were affirmed by the court en banc, as to, inter alia, the physical appearance of the Residence, the requirements for admission, the sums paid for food and lodging by the residents and the care and indulgence shown them by the members of the Salvation Army. It is only necessary to summarize these very detailed findings, according to them, of course, the conclusive effect they have upon us on appeal: *Halkias v. Liberty Laundry Co.*, 361 Pa. 475, 478, 64 A. 2d 800; *Norris Tl. & Mach. Co. v. Rosenlund*, 355 Pa. 560, 50 A. 2d 273.

The public contributed all of the funds required to purchase the land and erect the building, of which the Residence was found to be a component part. This building was erected for the purpose of providing a structure in downtown Pittsburgh in which the Salvation Army could carry on its benevolent and charitable activities of protecting and elevating the moral, spiritual and physical well-being of the under-privileged and needy, and since its completion the building has been used solely for that purpose.

The "Evangeline Residence" is conducted by the Salvation Army in furtherance of its eleemosynary purposes—not for profit or on a commercial basis, but solely to prevent young women of modest or no income and without homes in the City of Pittsburgh or from broken homes within the City from falling victims to the vices which inevitably exist in all large centers of population and to which they might be susceptible. The rooms of the Residence are small but adequate. They are never rented for a night and transients are not accepted. To gain admission every applicant is interviewed by an officer of the Salvation Army and must meet four qualifications: (1) the applicant must be a

young woman without a home within commuting distance of Pittsburgh or from a broken home within the city; (2) she must be less than thirty-five years of age and preferably less than twenty-five; (3) she must be in a low income bracket, if employed; and (4) she must be of a good moral character. The young women are informed, upon admission, that they will be required to leave when they attain the age of thirty-five. Admission to the Residence is customarily denied to those who earn a gross salary of more than $40 per week and the average gross income of the girls, at the time of the hearing, was found to be $29.15 per week. The rent paid for a room is based on what each young woman can afford to pay, varying at present from $3.55 to $7.55 a week. The only other charge which the residents pay is $7.70 a week for two meals a day. The learned chancellor found that the Salvation Army received from the residents an average of $12.64 a week, of which $5.49 was allocated to a room and $7.15 to the fourteen meals, or approximately eighty cents a night for a room and fifty cents per meal. In many instances girls have been given free accommodations during periods of financial difficulties and no effort is made to require them to pay for such when they have regained their ability to pay.

A study of hotel and restaurant rates in the City of Pittsburgh revealed to the chancellor that the average hotel guest pays as much per night for a room as the residents of the "Evangeline Residence" pay per week for a room and that these women are given their food at the Residence for approximately half of what they would be obliged to pay in one of the average city restaurants. Although there are no boarding or rooming houses in the vicinity of the Residence, the chancellor found that the prices charged in such places for rooms in other parts of the city were substantially higher than those paid by these young women.

Moreover, in addition to their room and board, numerous other facilities are made available to the residents free of charge. The gymnasium and swimming pool may be used by them at any time, and a playroom is available for them to engage in recreational games. The library is well stocked with good books and current literature for their education and enjoyment. A sewing room is available for the girls to make or mend their clothes and sewing lessons are given to those desiring them. The laundry and music room are likewise open to free use by the residents. The lounge is provided so that they may entertain their friends and is also used for weekly non-sectarian vesper services, lectures by prominent persons, and parties on special occasions which are sponsored and supervised by the Salvation Army for the benefit of the young women living in the Residence. The auditorium is used primarily for religious services to which all of the residents are invited. The Salvation Army at all times has trained personnel in the building to give counsel to the girls on their personal problems, to help them in times of sickness, to find employment for them, to take them to outside events and to do all in their power to create a homelike atmosphere.

Through the charitable efforts of the Salvation Army the residents of the "Evangeline Residence" receive not merely food and lodging, but also educational and recreational facilities, personal care and guidance, as well as many other comforts which are not measurable in dollars and cents alone. Certainly the nominal fee paid by the residents does not in any way approach the true value of those services. It is in fact but a token payment to help defray the operating expenses and to give the residents a feeling of financial independence. Were it not for the generous public contributions to the Salvation Army, the Residence could not be operated. It has always operated at a deficit

which, from 1937 to 1948, ranged between $13,328.77 and $36,477.14 a year. At the end of its 1949 fiscal year the Residence's loss for the year's operation amounted to $26,865.56, which loss must be, as always in the past, made up by popular subscription.

When it is considered that there are available to the residents many services and facilities, and that they are charged, at the most, but half as much for their rooms and food as they would be required to pay in the average commercial places in the city, little argument is necessary to show that "What . . . is given . . . [is] more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered": *Y.M.C.A. of Germantown v. Phila.*, supra. In that case we defined the characteristics of a charity as: "First, whatever it does for others is done free of charge, or at least so nearly free of charge as to make the charges nominal or negligible; second, that those to whom it renders help or services are those who are unable to provide themselves with what the institution provides for them, that is, they are legitimate subjects of charity." Obviously, the Residence meets those requirements.

Defendants have relied greatly on the *Germantown Y.M.C.A.* case, supra, where we held that the dormitory property involved was conducted as a business venture and consequently that the portion of the building so used was subject to taxation. The most casual reading of that case readily distinguishes it from the instant one. There, rooms were available to any person, including transients, at a price higher than that charged by boarding houses in the vicinity. It was obviously a business venture in competition with rooming houses and hotels. Here, rooms are available only for permanent residence of young women who are incapable of paying the rates charged by homes and hotels operated for profit. The Residence is in no way competing with

commercial enterprises. Findings as to the losses sustained from the operation of the Residence, the free accessibility of all the facilities to all the residents, the services and supervision furnished by the Salvation Army and the degree of religious influence further mark the distinction between the two cases and provide additional justification for the conclusion that the use and occupation of the "Evangeline Residence" is primarily for the "designated charitable object and not largely for commercial purposes".

The record in this case shows conclusively that the Salvation Army conducts the "Evangeline Residence" as a charitable institution within the meaning of Section 204 of the Act of 1933, as amended.. Hence, it is not subject to taxation by defendant municipalities, and the decree granting the relief sought by plaintiff was properly entered.

Decree affirmed, at appellants' costs.