**NATIONAL CHURCH RESIDENCES
OF MERCER COUNTY,**
Appellant

v.

**MERCER COUNTY BOARD OF
ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued May 8, 2007.
Decided May 31, 2007.

Stanley J. Parker, Pittsburgh, for appellant.

William G. McConnell, Jr., Sharon, for appellee.

BEFORE: COLINS, Judge, PELLEGRINI, Judge, and FRIEDMAN, Judge.

OPINION BY Judge PELLEGRINI.

National Church Residences of Mercer, PA (Mercer) appeals from an order of the Court of Common Pleas of Mercer County (trial court) denying its application for tax

exempt status as a charitable organization for its Buchanan Manor property because it did not donate a substantial portion of its services or relieve the government of some of its burden in the operation of that facility.

In 1998, Mercer applied for real estate tax exemptions for Buchanan Manor for tax year 1998 and subsequent years. On November 19, 1998, the Mercer County Board of Assessment Appeals (Board) issued a decision denying the request. Mercer appealed the Board's decision to the trial court alleging that it was entitled to exemption from real property tax because it met its burden of establishing that the property satisfied the statutory criteria set forth in the General County Assessment Law;[1] the Fourth to Eighth Class County Code;[2] and the Institutions of Purely Public Charity Act (Charity Act);[3] and it met its burden of proving Mercer was a purely public charity within the meaning of article VIII, section 2(a)(v) of the Pennsylvania Constitution.

The facts of this case as found by the trial court are not in dispute. Mercer[4] owns Buchanan Manor,[5] a five-story, 40 unit apartment building that provides housing to low-income, elderly individuals. Mercer constructed the building through financing under a program authorized by the United States Department of Housing and Urban Development (HUD) pursuant to Section 202 of the Federal Housing Act of 1959, 12 U.S.C. § 1701q.[6] Under that program, it entered a Regulatory Agreement (Agreement) with HUD in 1985 which provided up to $1,897,100 in financing. That loan bore no interest, and no repayment was required as long as housing remained available for very low-income elderly persons.

In conjunction with this Agreement, Mercer also entered into an assistance

1. Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3).

2. Act of May 21, 1943, P.L. 571, *as amended,* 72 P.S. § 5453.202.

3. Act of November 26, 1997, P.L. 508, 10 P.S. § 371–385.

4. As explained by Mercer in its brief, it was formed in 1983 as a result of a collaboration of Presbyterian churches founded in 1961 by the National Church Residences in Columbus, Ohio, for the purpose of providing low-cost housing to senior citizens with modest incomes. The ministry grew, and National Church Residences expanded its reach outside of Ohio and founded a network of affiliated charities, one of which was Mercer. Mercer was formed as a non-profit organization devoted to providing low-cost housing facilities and related services to the elderly and handicapped. (Mercer's brief at 5–6.)

5. Buchanan Manor is located at 73 Mercer Avenue in Wheatland Borough, Mercer County, Pennsylvania.

6. The intended purpose of the facility was to provide housing to low-income, elderly and handicapped persons under Section 202 of the Federal Housing Act of 1959, 12 U.S.C. § 1701q. Under subsection (b) of Section 1701q, HUD is "authorized to provide assistance to private nonprofit organizations and consumer cooperatives to expand the supply of supportive housing for the elderly. Such assistance shall be provided as (1) capital advances in accordance with subsection (c)(1) of this section, and (2) contracts for project rental assistance in accordance with subsection (c)(1) of this section. Such assistance may be used to finance the construction, reconstruction, or moderate or substantial rehabilitation of a structure or a portion of a structure, or the acquisition of a structure to be used as supportive housing for the elderly in accordance with this section. Assistance may also cover the cost of real property acquisition, site improvement, conversion, demolition, relocation, and other expenses that the Secretary determines are necessary to expand the supply of supportive housing for the elderly." Pursuant to 12 U.S.C. § 1701q(d)(2), an initial term of a contract entered into with HUD shall be 240 months.

contract with HUD to receive housing assistance subsidies as authorized under its "Section 8" housing program.[7] Under this housing program, non-profits and for-profits[8] can be paid with Section 8 funds. Some Section 8 assistance is provided through a voucher system where low-income families can use vouchers to lower their rent in a private market. The vouchers are administered by public housing authorities at a local level. Another way is for non-profits to enter a contract with HUD that gives them direct funds for apartments occupied by individuals who fall within the federal income limits.[9] Under this program, a contract rate is set at which, if occupied by qualified individuals, HUD will make up any difference in rent that the tenant does not pay.

The contract rent rate for Buchanan Manor apartments is set by HUD based upon Mercer's historical costs and expenses and what Mercer anticipates its administrative, maintenance, repair costs and utility expenses will be.[10] In calculating the contract rent rates, HUD requires Mercer to submit a "zero based" budget[11] forecasting expenses for the next year. Included in expenses are the *anticipated real estate taxes for which HUD would reimburse Mercer.* If Mercer does not incur real estate tax expenses, HUD would reduce the contract rent, resulting in a reduction of the HUD rent subsidy.

Buchanan Manor residents do not pay these contract rent rates, but instead receive rent subsidies under Section 8 which are based on income, family composition, extent of exceptional medical or other expenses and other financial needs. No resident is asked to pay more than 30% of their adjusted income toward rent. The actual percent of subsidy provided is de-

---

**7.** 42 U.S.C. § 1437(f), referred to as "Section 8 Housing," provides the following:

> (a) Authorization for assistance payments
> For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with provisions of this section.
> (b) Other existing housing programs
> (1) In general
> The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section. In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

**8.** Notably, 42 U.S.C. § 1437(f) does not preclude for-profits from receiving assistance.

*See e.g., Young v. Pierce,* 685 F.Supp. 975 (E.D.Tex.1988).

**9.** In the case of Buchanan Manor, the head of the household must either be 62 years old or physically handicapped. Mercer accepts all qualified applicants and residents regardless of their ability to pay, and, in fact, the apartments are only available to those who qualify under federal standards as "very low income." In 1999, "very low income" was defined as having an income of $12,850, and in 2005, it was defined as having an income of $17,050. Mercer attempts to rent at least 40% of the apartments to residents who qualify under federal standards as having "extremely low income." In 1999, "extremely low income" was defined as having an income of $7,700 and in 2005, it was defined as having an income of $10,250 or below.

**10.** The monthly contract rent rate as of December 31, 1999, for a one-bedroom apartment was $831 and as of December 31, 2005, was $983.

**11.** A "zero based" budget anticipates that annual revenues will equal annual expenditures,

termined by dividing the amount of rent actually paid by the tenant by the contract rent rate. For all of the years at issue in this appeal, 100% of Buchanan Manor residents received a rent subsidy.[12] Buchanan Manor residents also receive monetary allowances each month to use towards utility expenses. None of the residents at Buchanan Manor could afford to pay the costs of a comparable unsubsidized apartment.

Regarding Mercer's financial picture, prior to depreciation, for the year 1999, Mercer recognized a financial gain of $5,233; in 2000, it recognized a loss of $19,126; in 2001, it recognized a loss of $3,722; in 2002, it recognized a gain of $13,732; in 2003, it recognized a loss of $1,025; in 2004, it recognized a gain of $5,715; and in 2005, it recognized a gain of $5,899. For the years 1999 through 2005, Mercer had a total net cash profit or surplus of $6,706 before depreciation. For the years 1999 through 2005, after deducting for depreciation, Mercer has suffered a loss every year. If ever there are surplus funds at fiscal year end, Mercer must deposit the funds into a federally insured account and cannot use them for any purpose that is not for use at Buchanan Manor or for a purpose approved by HUD. During fiscal years 1998 through 2003, Mercer's annual revenues averaged $408,035 and never rose above $450,000. Pursuant to paragraph (5) of the Agreement between HUD and Mercer, Mercer is required to maintain a reserve fund in an amount approved by HUD for replacement of structural elements and mechani-

cal equipment for the project or for any other purpose after receiving HUD's written consent. According to the audited financial reports for the fiscal years 1999 through 2005, the balances in that reserve fund were $61,935 for 1999 and $80,919 for 2005. When fiscal year end is near, if Mercer finds that its revenues and reserves are insufficient to cover its expenses, it will defer its payables until the next fiscal year so that it is able to operate on a cash flow basis, although recognizing a loss on an accrual basis. Other than federal subsidies and rent paid by the tenants, no funds are supplied by Mercer to support Buchanan Manor's operation.

Mercer has a President, Mark Rickets, and a Vice President and Secretary/Treasurer, Joseph Kasberg, who are employed and paid compensation by NCR, the parent company. Their collective salaries from NCR for 1995, as reflected on Mercer's tax return for 2005, were $440,692. Mercer's trustees, though, serve without compensation. For the years 1998 to the present, a management fee was paid by Mercer to its parent company, NCR, at the rate of 6.17% of Mercer's gross operating revenues. For this fee, NCR hires, trains and fires Mercer employees; prepares Mercer's budget, financial statements and tax returns; and monitors NCR's compliance with HUD regulations. NCR employs four individuals, including a part-time property manager; a part-time office assistant; a full-time maintenance supervisor; and a part-time service coordinator.[13] The service coordinator position is a paid salary position.

resulting in a year-end net profit or surplus of zero dollars.

12. In 1999, 89% of Buchanan Manor residents received a rent subsidy of 75% or more. In 2005, 90% of the residents received a rent subsidy of 75% or more.

13. The service coordinator performs the following duties:
   (a) arranges meal services, such as Meals on Wheels, for those residents unable or unwilling to prepare their own meals;
   (b) arranges telephone, TV cable, medical, and other services;

Since 1984, the Pennsylvania Department of Revenue has continuously granted sales and use tax exempt status to Mercer. However, Mercer is required by HUD to attempt to minimize all of its expenses, which includes attempting to obtain an exemption from local real estate taxes.[14] Mercer has paid real estate taxes every year of Buchanan Manor's existence, and the continuation of the real estate tax liability will not financially impair its ability to continue its operations. If Mercer is entitled to a refund from Mercer County for real estate taxes paid from 1999 through 2005, the refund due as of December 31, 2005, is $42,268.31. If it is entitled to a refund from the Borough of Wheatland for taxes paid during the year 2000, the refund due as of December 31, 2005, is $37,736.09. If it is entitled to a refund from the Farrell Area School District for real estate taxes paid during the year 2000, the refund due as of December 31, 2005, is $126,560.47.

Based on these findings, the trial court denied Mercer's appeal and affirmed the Board's decision denying the tax exemption because it did not donate a substantial portion of its services or relieve the government of some of its burden as the entire funding for the project, except for the rent paid by the tenants, was derived from the federal government, and Mercer had not assumed any financial risk. Specifically, the trial court pointed out that:

> The constructions costs [for Buchanan Manor] were obtained through a HUD mortgage under Section 202 of the

Housing Act of 1959, 12 U.S.C. § 1701q. Mercer receives rental subsidies, also known as housing assistance payments, on behalf of its tenants under Section 8 of the Housing Act of 1937, as amended, 42 U.S.C. § 1437f. Mercer charges its tenants' rent amounting to the difference between the "contract rate" established by HUD and the rental subsidy paid by HUD on behalf of each tenant. Mercer does not receive any contributions of any consequence. Virtually all of Mercer's revenues are derived from the HUD rental subsidies and tenants' rental payments. For example, in 2005, 82.24% of the total rents were subsidized by HUD and 17.76% were paid by the tenants.

(Trial court's December 30, 2005 decision at 20.) This appeal by Mercer followed.

## I.

An entity seeking a statutory exemption for taxation, which Mercer does under the General County Assessment Law and the Fourth to Eighth Class County Code, must first establish that it is a purely public charity under article VIII, section 2(a)(v) of the Pennsylvania Constitution which provides, in relevant part:

> (a) The General Assembly *may by law exempt from taxation:* ... (v) *Institutions of purely public charity,* but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution. (Emphasis added.)[15]

(c) assists residents in their transportation needs;

(d) assists residents in completing insurance forms and obtaining insurance benefits;

(e) helps residents to obtain special need and medical equipment;

(f) provides crisis support; and

(g) provides educational programs.

14. Failure to obtain an exemption in no way disqualifies Mercer from participating in Section 202/Section 8 programs.

15. The electors in 1968 amended the Pennsylvania Constitution to make the following changes regarding tax exemptions.

| 1968 Pa. Const. Art. VIII, Section 2(a). | Former Art. VIII, Sec. 1, Repealed by 1968 |
|---|---|

■ Under this provision of the Constitution, the General Assembly was given the authority to exempt but was not required to exempt institutions of public charity. Because what was a "purely public charity" was contained in the Constitution, only the courts can interpret whether an institution is a "purely public charity" before a tax exemption can be granted, and the definition of that term is now solely for the courts.

The General Assembly has also enacted the Charity Act setting forth provisions relating to whether an institution is entitled to a tax exemption.[16] Before looking at those provisions or other statutory provisions, our Supreme Court in *Community Options Inc., v. Board of Property Assessment, Appeals and Review,* 571 Pa. 672, 813 A.2d 680 (2002), held that it must first be determined whether the entity met the constitutional requirements of being a purely public charity and whether the property was being used for a charitable purposes stating:

> An entity seeking a statutory exemption for taxation must first establish that it is a "purely public charity" under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory exemption can be reached. In *Hospital Utilization Project,* this Court set forth a five-part test for determining whether an entity qualifies as a "purely

| Section 2. Exemptions and Special Provisions: | Amendments |
|---|---|
| (i) Actual places of regularly stated religious worship; | "actual places of religious worship" |
| (ii) Actual places of burial, when used or held by a person or organization deriving no private or corporate profit therefrom and no substantial part of whose activity consists of selling personal property in connection therewith; | "places of burial not used or held for private or corporate profit" |
| (iii) That portion of public property which is actually and regularly used for public purposes; | "public property used for public purposes" |
| (iv) That portion of the property owned and occupied by any branch, post or camp of honorably discharged servicemen or servicewomen which is actually and regularly used for benevolent, charitable or patriotic purposes; and | "real and personal property owned, occupied and used by any branch, post or camp of honorably discharged soldiers, sailors, and marines" |
| (v) Institutions of purely public charity, but in the case of any real property tax exemption only that portion of real property of such institution which is actually and regularly used for the purposes of the institution. | "institutions of purely public charity" |

16. The Charity Act was adopted by the General Assembly in 1997 following the decision in *Hospital Utilization Project v. Commonwealth (HUP),* 507 Pa. 1, 487 A.2d 1306 (1985), *infra.* Section 5 of the Charity Act, 10 P.S. § 375(b)-(f), provides that an institution of purely public charity is one which meets the following criteria:

> (a) the institution advances a charitable purpose;
> (b) the institution operates entirely free from private profit motive;
> (c) the institution must donate or render gratuitously a substantial portion of its services; and
> (d) the institution must benefit a substantial and indefinite class of persons who are legitimate subjects of charity.

Mercer also contends that it is entitled to an exemption under this Act. Because the standards are the same as set forth in the *HUP* test to be considered a public charity and assuming that our Supreme Court does not refine that test, if Mercer meets the *HUP* standards, it is entitled to an exemption under the Charity Act. Conversely, if it does not meet the *HUP* standards, then there is no need to determine if it met the Charity Act.

public charity" under the Pennsylvania Constitution.

*Id.* at 676, 813 A.2d at 683.

■ The five-part test mentioned above set forth in *HUP* provides that an entity must possess the following characteristics to be considered a "purely public charity:"

(a) it advances a charitable purpose;

(b) it donates or renders gratuitously a substantial portion of its services;

(c) it benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) it relieves the government of some of its burden; and

(e) it operates entirely free from private profit motive.

Mercer argues that the trial court erred in determining that it was not a purely public charity to be exempt from real estate taxes because it did not meet Constitutional requirement (b) in *HUP*.[17] It argues that it does donate or render gratuitously a substantial portion of its services [18] and relies on the following factors to demonstrate that is has satisfied its burden:

17. At oral argument, Mercer contended that our Supreme Court's holding in *Alliance Home of Carlisle, Pa. v. Board of Assessment Appeals,* 591 Pa. 436, 919 A.2d 206 (2007), displaces the *HUP* test and no longer makes it viable. However, Mercer misunderstands that the facts in *Alliance* are much different than those in this case, and *Alliance* is of little value. In *Alliance,* Chapel Pointe owned and operated a continuing care retirement community that included a skilled nursing facility, an assisted living facility and an independent living apartment facility. Chapel Pointe had been given status as a purely public charity as had both its skilled nursing facility and its assisted living facility which were exempt from real estate taxes. The issue in *Alliance* was whether its independent living apartment facility should also be exempt from real estate taxes. Because there was no question that the institution involved in *Alliance* was an institution of purely public charity, our Supreme Court stated, "The theoretical complexities that might arise where the *HUP* test and the Act 55 [Charity Act] test would lead to different conclusions concerning a taxpayer's qualification as an institution of purely public charity are not presented in the case *sub judice.* The parties agree that appellant is an institution of purely public charity; their substantive dispute involves the proper approach to parcel review.... The constitutional test respecting parcel review, then, is not the *HUP/* Act 55 test, which is designed to identify qualifying *institutions,* but a test focusing on the actual and regular *use* that the qualifying institution makes of its property and the relationship of that use to the institution's purposes." *Id.* at 465, 919 A.2d at 223–224.

Because the *HUP* test was not at issue, it merely has no application to the issue at hand, and *HUP* is not being displaced.

18. Mercer relies on the following Supreme Court cases to support the proposition that it donates a substantial portion of its services and qualifies as a purely public charity: *Trustees of Academy of Protestant Episcopal Church v. Taylor (Episcopal Church),* 150 Pa. 565, 25 A. 55 (1892); *YMCA of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204 (1936). However, these cases do not support Mercer's position. In *Episcopal Church,* our Supreme Court held that the Episcopal Academy was a purely public charity because it was not run like a business, and any monies obtained were put back into the school for the purpose of allowing less fortunate students who could not afford to attend to become students. In *YMCA of Germantown,* our Supreme Court held that the Germantown YMCA was not a purely public charity because there was no proof that the rooms rented in the dormitory portion of the YMCA were not offered free of charge or that they were furnished at less than actual cost or that the expenses in maintaining them exceeded the gross receipts. The Court expanded its concept of a purely public charity from its decision in *Episcopal Church* and stated that "the portion of its property, in respect to which exemption is claimed, must possess an eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit. What is 'given' must be more nearly gratuitous than for a price which impresses one as being proportionate to the service rendered." *Id.* at 409, 187 A. at 208.

- Buchanan Manor apartments are only available to those who cannot otherwise afford such housing;
- Mercer gives the benefit of what it might keep as surplus revenue to Buchanan Manor residents in the form of significant rent reductions;
- As a result of those substantial rent reductions through federal subsidies, Mercer provides housing to Buchanan Manor residents at rents that are much lower than both actual costs and comparable market prices;
- Mercer provides, through federal subsidies, apartment housing to some residents at 10% of costs, to some residents at 25% of costs, and to all residents at a cost that is less than comparable housing;
- Mercer's directors serve without compensation; and
- Mercer can never accumulate a profit because all excess monies must go into the Federal Government Reserve Fund for debt services and mortgage amortization.

Mercer further believes that it has met the donation requirement because it makes a *bona fide* effort to service those persons who are unable to afford the usual fee, and the trial court found that "none of the residents at Buchanan Manor could afford to pay the costs of a comparable unsubsidized apartment" and for "all of the years at issue in this appeal, 100% of Buchanan Manor residents receive a rent subsidy."

(Trial court's December 30, 2005 decision at 7–8, findings of fact 40, 43.)

■ The Board disagrees that Mercer donates a substantial amount of its services as required by HUD or gratuitously renders any service to the low-income elderly residents of its Buchanan Manor apartment facility because the federal government is subsidizing the residents of Buchanan Manor, not Mercer. It explains that Mercer is merely a conduit through which the federal government constructed and subsidized residential apartments for the low-income elderly and handicapped. We agree with the Board that Mercer fails to meet its burden for the following reasons.

As the Board points out, pursuant to Mercer's Agreement with HUD, all of the expenses of Mercer's apartment facility, **including real estate taxes** and debt service, are paid from a combination of federal subsidies and private rental payments. The Agreement provides for zero-based budgeting which means that each year, the costs of operating the apartment facility are equal to the facility's total revenues. Zero-based budgeting results in Mercer *not having to assume any financial risk in the operation of Buchanan Manor* because the federal government is obligated to increase its subsidies to compensate for any increase in operational costs, including any increase in real estate taxes. In other words, Mercer donates nothing to operate Buchanan Manor, and this was confirmed by Kasberg.[19]

---

19. The dialogue between counsel and Kasberg was as follows:

Q. Now, does Mercer itself, with its own funds, not the funds that it receives from subsidies rental payments, contribute anything to the operation of this facility?
A. I don't understand the question. The only revenue it has is what you see on these financial statements.

Q. So, above and beyond the revenue that is reflected on these financial statements, is Mercer donating anything from the entity itself to service the residents in that facility?
A. You see the revenues here. I don't necessarily understand the question. I don't know of anything else that Mercer has or is.

Mercer's witness also stated at trial that Buchanan Manor operated annually at a net deficit, inferring that the corporation ran a cash-flow deficit which required Mercer to make-up or donate the difference. However, Logan testified that he reviewed the Statements of Profit and Loss contained in Mercer's Audited Financial Reports for years 1999 through 2005, and they reflected that Mercer operated at a net profit each of those years from a cash-flow standpoint before depreciation, even after the inclusion of the management fee reflected as a line-item expense. Additionally, the audited financial statements and tax returns reflect that Mercer had operated at a net profit before depreciation with positive cash-flow.

The facts of this case are almost identical to those in *G.D.L. Plaza Corporation v. Council Rock School District (G.D.L.) (Gloria Dei Lutheran Church)*, 515 Pa. 54, 526 A.2d 1173 (1987).[20] In *G.D.L.*, a nonprofit corporation wanted to construct an apartment complex for low-income elderly and handicapped persons and claim a tax exemption from the construction tax as a charity founded, endowed and maintained as public charity. *See* 72 P.S. § 5020–204(a)(3). HUD financed the apartment complex pursuant to Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q. All of the residents were authorized to receive monthly assistance with their rent payments between 25% of their income and the maximum monthly rent for the unit. The service G.D.L. provided was transportation; each resident's unit had a call button for assistance; G.D.L. provided assistance with doctors' visits and counseling and financial problems; and the entire financial support for the project was derived from the federal government. A management fee was paid based on a percentage of the revenue generated by the rents received, and gross rents covered 100% of G.D.L.'s operating costs. Relying on the *HUP* test, this Court found that G.D.L. did not donate a substantial portion of its services. On appeal, our Supreme Court affirmed, focusing on the fact that the federal government footed the bill for everything, and G.D.L. would not be adversely affected by subjecting its property to real estate taxes. The Court agreed that all operating costs of G.D.L. not covered by the tenants' rents were paid by the federal government, including salaries of those "who provide the services for [G.D.L.] and the expenses for the services themselves, all of which are channeled through the management fee paid to G.D.O. (Gloria Dei Outreach Corporation) from revenue obtained from the government subsidies." *Id.* at 63, 526 A.2d at 1177. The Court went on to state:

> Q. Well, one of the things that you're claiming to be a purely public charity and what I am trying to get at is that other than the federal subsidies that are given to you, which are substantial, correct?
> A. That is correct.
> Q. And the rental payments that come in from the residents that live there that are subsidized, does your entity claim to be a purely public charity—
> A. It has no other sources of revenue, if that's what you're asking.
> Q. But other than revenue, does it give anything to the facility above and beyond the subsidies and—

> A. It has no other sources to give anything.
> (Reproduced Record at 170a–171a.)

20. The trial court stated and we agree that the *G.D.L.* case was decided before the enactment of the Charity Act in 1997, and that it was decided under the General County Assessment Law rather than the Fourth to Eighth Class County Code. However, it found these differences to be immaterial to the outcome of the case because the *G.D.L.* case was decided under the constitutional standard enounced in the *HUP* case and not under any statutory provision.

Close scrutiny reveals that the foregoing circumstances occur not fortuitously, but by design. The federal government as a matter of policy has provided that the Department shall coordinate the implementation of the Section 202 mortgage loan program and the Section 8 housing assistance payments program. 12 U.S.C. § 1701q(g). Non-profit organizations are thus encouraged to undertake the work of increasing the housing supply for elderly and handicapped people *without assuming any financial risk.* (Emphasis in original.)

*Id.* The Court further pointed out that the contract provided for the HUD secretary to make additional adjustments to the monthly rent to reflect increases as a result of necessary expenses of owning and maintaining the units resulting from substantial general increases in real property taxes among other costs.[21] More recently, in *WRC North Fork Heights, Inc. v. Board of Assessment Appeals, Jefferson County,* 917 A.2d 893 (Pa.Cmwlth.2007), this Court, also citing *G.D.L.,* held that a low-income housing facility for the elderly relying solely on federal subsidies was not exempt from real estate taxes because it did not meet the *HUP* test.

As for the services Mercer alleges it donates to its residents—assisting residents with completion of insurance forms or obtaining insurance benefits; arranging phone, cable, medical and other services and assisting with payment schedules for the activities; crisis intervention and support; meals; mental health issues; transportation; education and wellness programs; and helping residents obtain equipment and devices, such as walkers, wheelchairs, talking books, large print telephones and other visual hearing and physical aide—as pointed out by opposing counsel at oral argument, that position is required by HUD pursuant to 12 U.S.C. § 1701q(g)(1), (2) and (3). Those sections provide, in relevant part, the following:

(g) Provisions of services

(1) In general

In carrying out the provisions of this section, the Secretary shall ensure that housing assisted under this section provides a range of services tailored to the needs of the category or categories of elderly persons ... occupying such housing.

(2) Local coordination of services

The Secretary shall ensure that owners have the managerial capacity to—

\* \* \*

(B) coordinate the provision of supportive services and tailor such services to the individual needs of residents;

(3) Service coordinators

Any cost associated with employing or otherwise retaining a service coordinator in housing assisted under this section shall be considered an eligible cost under subsection (c)(2) of this section [relating to project rental assistance] ... To the extent that amounts are available pursuant to subsection (c)(2) of this section for the costs of carrying out this paragraph within a project, an owner of housing assisted under this section *shall provide a service coordinator* for the housing to coordinate the provision of

---

**21.** Mercer also contends that the trial court misinterpreted our Supreme Court's ruling in *G.D.L.* because the trial court mistakenly believed that the Supreme Court denied G.D.L.'s tax exemption application on constitutional grounds when it actually denied it on statutory grounds. While it may have been on statutory grounds, the founded, maintained and endowed standards concept applies also to determine whether an institution is a "purely public charity."

services under this subsection within the housing. (Emphasis added.)

12 U.S.C. § 1701q(c)(2) provides:

(2) Project rental assistance

Contracts for project rental assistance *shall obligate the Secretary to make monthly payments to cover any part of the costs attributed to units occupied* (or, as approved by the Secretary, held for occupancy) by very low-income elderly persons that is not met from project income. (Emphasis added.)

Because HUD mandates that owners of housing who receive rental subsidies provide a service coordinator for its residents, and the cost of providing that position is paid by HUD to the owners, Mercer cannot argue that it has donated this service.

Not only does Pennsylvania support the disallowance of a real estate tax exemption when an entity carrying out a federal program provides all the funds not received from tenants, but other jurisdictions do so as well. In *Pittman v. Sarpy County Board of Equalization*, 258 Neb. 390, 603 N.W.2d 447 (1999), the Supreme Court of Nebraska unanimously held that the Tax Equalization and Review Commission properly denied a real estate tax exemption to the owner of an apartment complex because it was not charitable, and to support the denial of a tax exemption, only property that was owned by "educational, religious, charitable or cemetery organizations and used exclusively" for those purposes was exempt from property taxes. *Id.* at 454. The Court determined that the apartment complex was not tax exempt, noting that it was self-supporting based on rent and rent subsidies from HUD. It stated that just because the facility provided low-income housing did not make the property charitable.

Similarly, in *Housing Southwest, Inc. v. Washington County*, 128 Idaho 335, 913 P.2d 68 (1996), the Supreme Court of Idaho disallowed a tax exemption and held that Housing Southwest was not providing a charitable function because the Farm Home Administration had provided the construction loan for the construction of the six-unit low-income housing facility for senior citizens and disabled persons and was also providing subsidies for their rent. The Court focused on whether the housing facility was supported by donations and stated that outside donations were an important charitable factor because "they reduce the cost to the general public of the service being provided." *Id.* at 71. It went on to state that federal subsidies were not donations in determining whether Housing Southwest was entitled to a property tax exemption.[22] For other cases also holding that federal subsidies are not donations, see *Clark v. Marian Park, Inc.*, 80 Ill.App.3d 1010, 36 Ill.Dec. 241, 400 N.E.2d 661 (1980); and *Parker v. Saint Stephen's Urban Development Corporation*, 243 N.J.Super. 317, 579 A.2d 360 (1990).

In this case, the subsidies received by Mercer are its only source of revenue other than the rent it receives from its residents. Mercer was unable to provide any evidence of any way that it donates to Buchanan Manor to prove that it meets the second prong of the *HUP* test. Contrary to Mercer's comment at oral argument and the trial court's finding that if Mercer's real estate taxes were exempted, then a resident's rent would be reduced, that in no way indicates that Mercer has donated anything to Buchanan Manor. All

---

**22.** The Supreme Court in this case also focused more on the issue of whether the facility reduced the government's burden rather than on whether it donated a substantial portion of its services.

that proves is that the federal government has decreased its own subsidy.

Consequently, based on the holdings in *G.D.L.* and *WRC,* and with support from other jurisdictions as well, we agree with the trial court that Mercer did not and does not donate or render gratuitously a substantial portion of its services to Buchanan Manor because it is totally subsidized by HUD, and the subsidies are not donations. We agree with the Board that Mercer does not meet the second prong of the *HUP* test.

## II.

■ Mercer also argues that the trial court erred in determining that it did not relieve the government of some of its burden[23] because the trial court focused on "dollars and cents" rather than on Mercer promoting the good and welfare of the aged and poor. It contends that providing low-cost housing for the elderly with limited incomes constitutes a public charity even if the majority of the operating revenues are provided by government funds. Mercer relies on our Supreme Court's holdings in *In re Tax Appeals of the United Presbyterian Homes of the Presbytery of Huntingdon (Presbyterian Homes),* 428 Pa. 145, 236 A.2d 776 (1968), and *Four Freedoms House of Philadelphia, Inc. v. The City of Philadelphia (Four Freedoms House),* 443 Pa. 215, 279 A.2d 155 (1971), to support the proposition that providing homes for the aged falls into the category of relieving the government of some of its burden because otherwise, the government would have to provide such facilities, and historically, the government has provided such housing to the aged.

In *Metropolitan Pittsburgh Nonprofit Housing Corporation v. Board of Property Assessment, Appeals and Review,* 480 Pa. 622, 391 A.2d 1059 (1978), our Supreme Court distinguished both *Presbyterian Homes* and *Four Freedoms House* for the very reason that they emphasized the age of the tenants in determining that the use of the homes was a charity and determined that it would be an unjustified extension of the constitutional concept of a purely public charity based strictly on age. The Court noted that whether an entity was a purely public charity did not depend solely on the age of those who lived in the housing project and benefited from the charity, and concluded that the Lemington Heights Housing Project was not a purely public charity because the federal government subsidized the mortgage interest payments to Metropolitan, and Metropolitan rented the units to low-income families who were approved by HUD in accordance with a rent schedule established by HUD. The families who rented from Metropolitan also received rent supplement payments from HUD, and HUD paid annual real estate taxes. *See also WRC North Fork Heights, Inc.* Consequently, Mercer's argument is without merit, and Mercer does not relieve the government of some of its burden.[24]

---

23. In order to relieve the government of some of its burden, an institution provides services that would otherwise fall to the government to provide or which the government has historically provided. *HUP.* While there is no question that Mercer provides the actual residence for the residents and undertakes the day-to-day needs of those residents, it is the federal government that underwrites the costs of all of the funds that makes that possible.

24. Mercer also argues that the trial court erred when it failed to apply the rebuttable presumption adopted in Section 6 of the Charity Act, 10 P.S. § 376, and placed the burden on Mercer to prove its tax exempt status. However, because we have determined that Mercer has not met the constitutional standard of what is a "purely public charity," Mercer is not entitled to any presumption, and Section 6 of the Charity Act is not applicable.

Accordingly, the order of the trial court is affirmed.[25]

### ORDER

AND NOW, this 31st day of May, 2007, the order of the Court of Common Pleas of Mercer County, dated December 30, 2005, is affirmed.

---

**25.** Because we have determined that Mercer is not a purely public charity, it is not entitled to a refund of the taxes it paid since the filing of the exemption appeal in 1998.